Oswego Township v. Anderson *et al.*

# JULY TERM, 1890.

### PRESENT:

Hon. ALBERT H. HORTON, Chief Justice.
Hon. DANIEL M. VALENTINE, } Associate Justices.
Hon. WILLIAM A. JOHNSTON, }

Oswego Township, *in Labette County*, et al., v. Joseph Anderson *et al.*

1. Bonds *to Aid Railroads — City not Detached from Township, nor Relieved from Tax to Pay.* The village of Oswego, situated within and forming a part of the township of Oswego, Labette county, undertook, in 1871, to incorporate as a city of the second class, under chapter 59, Laws of 1871, which was an unconstitutional and void act. Afterward, city officers, except city assessor, were elected within the city, and the inhabitants thereof exercised many of the privileges and performed many of the duties provided and imposed by law upon cities of the second class. The township elections, however, were held within the city in 1871, 1872 and 1873, and the people of the city participated in the elections and voted for the election of township officers, and upon all other questions submitted at such elections. No city assessor was chosen during the years of 1871 and 1872, but the inhabitants of the city joined with the people of the township and selected a township trustee, who assessed the property of the township and city, and the trustee and assessor thus chosen was a resident of the city. The township officers for the years 1871 and 1872 were residents and citizens of the town at the time of their election, and continued as such during their terms of office. Persons resident within the town were candidates for township officers against persons residing outside of the limits of the town, and in some cases defeated the outside candidates at the township elections. During the years 1871 and 1872 a large amount of township bonds was voted and issued in aid of railroads, and the petitions for the bond elections were signed by the inhabitants of the town, and they were largely instrumental in calling the elections and in voting the bonds upon the township. The voting-place and precinct for all these township elec-

tions were within the corporate limits of the city.  In June, 1880, the people of the city took steps to organize Oswego as a city of the second class, and perfected the organization under the general law. *Held*, That the act of 1871, under which the city attempted to incorporate, furnished no authority for a separation of the city from the township; and further, that the attempted organization and the steps and acts done and performed by the people of the city, did not create such a *de facto* municipality as will separate it from the township and release the people therein from the bonds which they assisted in voting upon the township; nor are they relieved from the payment of funding bonds issued by the township to cancel and satisfy the bonds originally issued, although the people of the city took no part in the funding operations. (*Brown v. Milliken*, 42 Kas. 769.)

2.  VOID CONTRACT *Between City and Township — Entire Territory Subject to Tax.*  A contract between the city officers and the township officers, and to which the holders of the bonds were not parties, adjusting the bonded debt between the city and the township, and stipulating that upon payment of a certain sum of money by the city to the township the city will be released from the lien of such bonds, and from taxation to pay the same, is unauthorized and void, and will not prevent a levy of taxes upon the property of the entire territory subject to taxation for the payment of such bonds in accordance with law.

*Error from Labette District Court.*

ACTION brought by *Joseph Anderson* and many other citizens and tax-payers of the city of Oswego, to enjoin the collection of taxes levied upon their property situate within the corporate limits of the city of Oswego.   The petition is in three counts: the first count is for an injunction against a ten-mill-tax levied to pay interest on $78,000 of funding bonds issued by Oswego township; the second seeks to enjoin a six-mill tax levied to pay interest on $46,000 of funding bonds issued by the township; and the third is for an injunction against a three-mill tax levied to pay interest on $20,000 of the funding bonds of the township.   It is alleged that the bonds were issued when the city of Oswego was not a part of the township, and the plaintiffs allege that their property within the city is not liable for the payment of the bonds, and that the taxes levied for that purpose are illegal.   After the issues had been closed by answer and reply, the cause was

submitted to the court upon a statement of facts agreed upon between the parties, which is as follows:

"1. The township of Oswego was duly organized as one of the municipal townships of Labette county in the year 1867, and as so organized included within the incorporated limits all the following territory, to wit: commencing at the intersection of the north line of the congressional township 33 south with the east line of Labette county, running thence south along the east line of said county, to the south line of said congressional township, thence west to the west line of range 22 east, thence north to the north line of said congressional township, thence east to the place of beginning.

"2. On February 8, 1870, the inhabitants of a portion of the territory of said township, to wit: the southeast quarter of the northwest quarter, the southwest quarter of the northeast quarter, the east half of the southwest quarter, and the southeast quarter of section 16, and the southwest quarter of section 15, and the north half of the northeast quarter of section 21, all in township 33 south, range 21 east, became and were duly incorporated as a town or village, under the provisions of chapter 108 of the general statutes of 1868.

"3. On the 1st day of July, 1870, there was issued by the proper county officers, for and in behalf of Oswego township, one hundred bonds for $1,000 each, aggregating $100,000, bearing interest at 7 per cent. per annum, payable annually, which bonds were issued in payment of a subscription of said township to the capital stock of the Missouri, Kansas & Texas Railroad Company, under the provisions of chapter 90 of the Laws of 1870, and pursuant to an election held in said township on the 17th day of May, 1870, at which the question as to whether said subscription should be made, and bonds issued, was submitted to the voters of said township.

"4. On the 15th day of October, 1872, said township issued twenty bonds of $1,000 each, aggregating $20,000, for the purpose of securing the building of two bridges across the Neosho river in said township, which bonds bore interest at the rate of 10 per cent. per annum, payable semi-annually. Said bonds were issued under the provisions of chapter 68 of the Laws of 1872, and pursuant to an election held on the 30th day of July, 1872, at which the question as to whether said bonds should be issued, was submitted to the qualified electors of said township.

"5. On the 2d day of September, 1872, there was issued by the proper county officers, for and in behalf of said township, eighty bonds of $1,000 each, aggregating $80,000, bearing interest at the rate of 10 per cent. per annum, payable semi-annually, which bonds were issued in payment of a subscription of said township to the capital stock of the Memphis, Carthage & Northwestern Railroad Company, under the provisions of chapter 68 of the Laws of 1872. Only $30,000, or thereabouts, of these bonds were ever delivered. The residue were placed in escrow, and it is claimed by the township that the terms of the escrow have not been complied with, and said bonds have not been delivered. There was no election held in said township directly authorizing the subscription of stock and issuance on bonds to the Memphis, Carthage & Northwestern, but on the 20th day of December, 1871, there was an election held authorizing the subscription of the same amount of stock and the issuance of the same amount of bonds to the State Line, Oswego & Southern Kansas Railroad Company, which company assigned all of its rights, subscriptions and franchises to the Memphis, Carthage & Northwestern Railroad Company; and it is claimed by the parties instrumental in having said bonds issued, that so long as the amount was the same and the company proposed to build the road on the same line, and was the assignee of the former company, that no new election was necessary, and the bonds were accordingly issued.

"6. At the time the elections were held as set forth in paragraphs 3, 4, and 5 hereof, the usual and only voting-place and precinct for said township was within the corporate limits of said village or city of Oswego, the inhabitants of which participated in and voted at each of said elections. The inhabitants of said village were generally in favor of the propositions submitted at said elections, signed the petitions therefor, and were largely instrumental in calling the elections and carrying them in favor of the propositions submitted.

"7. For many years no interest has been paid on any of the bonds mentioned, except about $1,200 upon a judgment which had been rendered for interest upon the bridge bonds mentioned, the citizens of the township, aided, advised and encouraged by the citizens of Oswego city, contesting in the courts the validity of each of the different issues of bonds mentioned. All of said bonds passed into the hands of persons who claimed to be innocent holders thereof for value, and numerous judgments were rendered in the circuit court

of the United States for the district of Kansas, against the township for interest that had accrued and matured upon each of the several issues of bonds described. In March, 1885, the indebtedness of said township on account of said bonds and accrued interest, including judgments for unpaid interest, amounted to $350,000, or more.

"8. On the 2d day of March, 1885, for the purpose of funding and canceling a portion of said indebtedness, said township issued the $78,000 in bonds, described in the petition, of which $48,000 were issued to compromise and cancel more than $130,000 of the indebtedness outstanding against said township, on account of said Missouri, Kansas & Texas railroad bonds mentioned in the 3d paragraph hereof, and $30,000 for the purpose of compromising and canceling more than $90,000 of the indebtedness outstanding against said township on account of the Memphis, Carthage & Northwestern railroad bonds mentioned in the 5th paragraph hereof. Said bonds were issued in compliance with the provisions of chapter 170 of the Laws of 1881, as amended by chapter 157 of the Laws of 1883.

"9. For the purpose of compromising and canceling the indebtedness existing against said township on account of said bridge bonds, and two of said Missouri, Kansas & Texas bonds, which, including accrued interest and judgments thereon, amounting to $63,000 or more, said township, on the 1st day of August, 1887, issued its bonds to the amount of $50,-000, of which $4,000 have been paid, and the residue of which are the $46,000 of bonds mentioned in the second cause of action in the petition. Said bonds were used in compromising and canceling the indebtedness existing against the said township on account of said bridge bonds, and on account of two of the Missouri, Kansas & Texas railroad bonds hereinbefore described.

"10. For the purpose of compromising and canceling another portion of the indebtedness existing against said township on account of a judgment rendered against it on a portion of the Missouri, Kansas & Texas railroad bonds before mentioned, amounting to about $45,000, said township on the 1st day of January, 1888, issued $20,000 in bonds, which, together with about $2,700 in money paid by said township, were used for the purpose of compromising said judgment, and which are the bonds mentioned in the third cause of action in the petition — it being agreed at the time as a part of said compromise by the trustees of said township that if de-

fault was made in the payment of any of the installments of interest maturing on said funding bonds or the principal thereof, then that said judgment should be in full force and effect against said township.  Said judgment was taken against said township by a confession of judgment made by G. A. Cooper, township trustee, upon bonds, a portion of which were not due at the time said judgment was taken.  The judgment creditor in whose favor said judgment was taken was Geo. S. C. Dow, who has since died, and proceedings are now pending to revive said judgment in the name of his executrixes.

"11. Before the bonds mentioned in paragraphs 9 and 10 were issued, elections were held in said township as then constituted, at which the question as to whether said funding bonds should be issued or not was submitted to the qualified electors of said township, which election in each case resulted in favor of the issue of said bonds by the majority required by law, and said bonds were issued in all respects in compliance with the law, and are valid and outstanding obligations against said township.  None of the citizens or inhabitants of the city of Oswego took part in the elections mentioned in this paragraph.

"12. In March, 1871, the authorities of the village or city of Oswego caused to be taken the steps prescribed by § 1 of chapter 59 of the Laws of 1871, and on the 16th day of the same month, and within twenty days after the presentation of the petition required by said act, enacted an ordinance dividing the city into wards, and providing for holding an election as provided by section 2 of said act.  Said election was held on the first Monday in April, 1871, and at each city election since that time said city has claimed the right to and has elected the officers, (not including city assessors,) and has exercised many of the privileges and performed many of the duties provided or imposed by law upon cities of the second class; the territory claimed by said city as included within its incorporate limits under this incorporation being described as follows: all the territory hereinbefore described in paragraph 2d; in 1873, ordinances were enacted by said city purporting to add to the city limits the following territory: the west half of the southwest one-fourth of section 16, and the northeast one-fourth of the northwest one-fourth of the northwest one-fourth of section 21, all in township 33, range 21, Labette county, Kansas; in 1880 ordinances were enacted by said city purporting to add to said city the following territory, to wit: the southeast one-fourth of section 17, and commencing at the

southeast corner of the southwest one-fourth of section 17, thence north 80 rods, thence west 76 rods, then south 80 rods, thence east 76 rods, to the point of beginning; the west one-half of the northeast one-fourth of section 20, the north half of the northwest one-fourth of section 21, the north half of the southwest quarter of the northeast quarter of section 21, the north one-half of the northwest one-fourth of section 22, commencing at the southeast corner of lot 3, section 15, thence north 6 rods, thence west 80 rods, thence south 6 rods, thence east 80 rods, to place of beginning; all of lot 2 in section 16 lying west of the county road, running from Commercial street in the city of Oswego to the Neosho river bridge, the southeast one-fourth of the northwest one-fourth of section 16, and the south one-half of the southwest one-fourth of the northwest one-fourth of section 16, all in township 33, range 21; in 1881 ordinances were passed purporting to add to said city the following territory: lot No. 3 in section 15, and lot No. 2 in section 16, all in township 33, range 21; the proceedings of the city council show that a city assessor was appointed in 1872 and in 1873, and that since that time the city has appointed an assessor each year; and further, that since and including the year 1872, the city of Oswego has had a board of education and a police judge.

"13. The township elections for the years 1870, 1871, 1872 and 1873 were held in said city, and within the territory described in the 2d and 12th paragraphs hereof, the inhabitants of said city participating and voting at such elections for township officers, and on all other questions submitted at such elections, and citizens residing in said city were elected to several of the township offices for three years, and served as such; C. F. Winton, T. E. Clark, and H. P. Newlon were elected to the offices of township trustee, treasurer, and clerk, respectively, of said township at the election held in April, 1871, and qualified and served as such officers, the said T. E. Clark and H. P. Newlon at the time of said election and during their entire term of office residing within and being citizens of said city. Joseph Nelson, H. L. Woodford and Andy Monfort were elected to the offices of township trustee, treasurer, and clerk, respectively, of said township for the year 1872, and qualified and served as such, all of said officers at the time of said election and during their entire term of office residing within and being citizens of said city; in several cases the persons named were candidates for said offices against persons residing outside of the limits of said city, and de-

feated such outside candidates at the election held in said city as aforesaid. For the years 1871 and 1872 said city had no city assessor, the territory included therein being assessed by the trustee of said township.

"14. In May or June, 1880, the territory described in the 2d paragraph hereof, together with some adjacent territory which was added thereto from the township, attained a population of two thousand or more, which fact was duly ascertained and certified to the governor of this state, who thereupon, to wit, on the 18th day of June, 1880, by public proclamation, declared said city subject to the provisions of the act governing cities of the second class, being chapter 100 of the Laws of 1872.

"15. A short time before the $20,000 in bonds described in the 10th paragraph hereof were voted and issued, to wit, on the 20th day of August, 1887, the question having been raised as to whether the city was or would be liable for funding bonds issued by the township, an instrument in writing was executed by the officers of the city and township, a copy of which is hereto attached, marked 'A,' and made a part hereof.

"16. On the 1st day of July, 1887, the officers of Oswego township and the mayor and clerk of the city of Oswego executed the instrument attached to the amended reply and made a part hereof.

"17. On the 3d day of January, 1888, the city of Oswego paid to Oswego township the sum of $2,060, on account of the $23,750 mentioned in said instrument, but since that time said city has not made any further payments on account thereof.

"18. Taxes were levied for the years 1875, 1876 and 1877 on all the property in Oswego township and city to pay the interest which had accrued on the bridge bonds mentioned in the 5th paragraph thereof, and for the year 1875 to pay a judgment or judgments for interest thereon, which taxes were paid by the plaintiffs so far as they then owned taxable property in said city for those years, and by all other tax-payers therein.

"19. For ten years, to wit, from 1877 to 1887, the township of Oswego had no qualified or acting township officers, the township being assessed by the so-called assessor appointed by the board of county commissioners of said county; and the funding operations during the period prior to 1887 were conducted by an agent or agents appointed for that purpose; C. M. Condon, acting for several years with others in that capa-

city. In 1883 the said C. M. Condon, J. B. Draper, A. T. Shrout, were such agents, the first-named being at all times a citizen of the city of Oswego, and during a portion of the time he was so acting being the mayor of said city.

"20. The defendant W. H. Porter was and is the duly-qualified and acting treasurer of Labette county, and as such he was about to collect the taxes mentioned in the petition; all the plaintiffs are the owners of taxable property within the limits of the city of Oswego, and the taxes mentioned in the petition were levied for the purpose of paying the interest maturing on the bonds described in paragraphs 8, 9 and 10 hereof, and such taxes are liens and charges upon the property owned by said plaintiffs in said city.

"21. The term 'village,' 'city,' or 'incorporation,' as used in the 6th, or any of the paragraphs hereof, shall not be held or construed in any manner affecting the question as to whether the city of Oswego was or was not at such times a city of the second class. The question as to such incorporation shall be determined from the facts stated, and not from the name or term designating such city or village.

"22. The parties are to have the right to introduce such proof as they may desire concerning the matters stated in paragraph 12 and paragraph 4, and as to any other not herein agreed upon.

"23. The parties reserve the right to object to the relevancy and materiality of the facts herein agreed upon."

During the progress of the trial the parties in open court made other admissions of fact, as follows:

"It is admitted that since the year 1873 there has been a city assessor appointed by the city of Oswego; that in the year 1888 the taxes were levied as alleged in the petition; that said city included within its corporate limits all the territory described in the petition as being within the corporate limits of said city. It is admitted by both parties that there was an agreement of a certain character entered into between the city and township, a copy of which is set up in the reply, and also set up in the findings of fact, with reference to the settlement of what are known as the 'Bolles' and 'Bolles claims.' It is admitted that, in the years 1870, 1871, 1872 and 1873 the assessed valuation of the property now claimed by the plaintiffs to be the city of Oswego, and the property outside of the city of Oswego, in Oswego township, was about the same; that since that time the property within said city

has materially increased in value, and is now and at the time
of the making of the levy complained of in this case was
largely increased over the valuation at the time before stated,
and is and was at the time of the levy complained of in this
action, largely in excess of the value of the property within
Oswego township as then constituted; that at the time of the
first division of the territory as claimed by the city, the tax-
able property in the township outside of the city and within
the city was substantially equal; that on the same territory
respectively at the last assessment before the levy of the tax
complained of, the assessed value of the same property within
the city was in the proportion following: three-fifths in the
city, and two-fifths in the township on the same territory as
on the first division, as at the time of the first division. It
is admitted that for the year 1888 the assessed value for
Oswego city as then constituted was more than double that
of Oswego township as then constituted, and that this dif-
ference in value in favor of the city was made up partly from
the increase of the value of the property within the city, and
partly from additions which were made to the city by taking
in the territory which had theretofore been a part of the town-
ship."

After the case was submitted, and on the 1st day of June,
1889, the court was about to announce its decision in the case,
when it suggested that if the pleadings showed a willingness
on the part of the plaintiffs to pay the portion of the tax levied
for the purpose of paying interest on $48,000 of the funding
bonds issued to refund bonds issued to the Missouri, Kansas &
Texas Railway Company, it would make the injunction as to
the balance of the tax, and which had been levied to pay the
interest on $30,000 funding bonds issued to fund the Memphis,
Carthage & Northwestern railway bonds, issued by the town-
ship, perpetual. The amendment was made as suggested, and
the court thereupon found that 5-13 of the 10-mill tax men-
tioned in the first cause of action is not a legal tax upon
property within the limits of the city of Oswego, and that
8-13 of the 10-mill tax is a legal tax against the property of
the plaintiffs within the limits of the city. It further found
that the taxes described in the second and third causes of
action were legal and valid taxes against the property of the

plaintiffs, and against all of the taxable property within the limits of the city of Oswego.

Judgment was rendered that the temporary injunction against the 5-13 of the 10-mill levy should be made perpetual, and that as to the 8-13 of the 10-mill levy, as well as the other taxes complained of, the injunction should be dissolved. Exceptions were taken by each party to the rulings adverse to it, and the case has been brought to the supreme court for review, both parties alleging error.

*Kimball & Osgood,* for plaintiffs in error.

*Morrison & McCune,* for defendants in error.

The opinion of the court was delivered by

JOHNSTON, J.: Three classes of bonds which have been issued by Oswego township, Labette county, are involved in this action. The first is what is known as the Missouri, Kansas & Texas railroad bonds, issued July 1, 1870, in pursuance of an election held May 17, 1870; the second were bridge bonds, originally issued October 15, 1872, in pursuance of a vote taken July 30, 1872; and the third were the Memphis, Carthage & Northwestern railroad bonds, issued September 2, 1872, upon a vote taken December 20, 1871. The vote last mentioned authorized the issuance of $80,000 of bonds to the State Line, Oswego & Southern Kansas Railroad Company, which company transferred its rights, subscriptions and franchises to the Memphis, Carthage & Northwestern Railroad Company, after which and upon the date mentioned $30,000 of the amount voted was delivered to the latter company. The validity of these various classes of bonds was contested in the federal court, and judgments sustaining their validity and in favor of the holders of each class were rendered. When the indebtedness arising from the issuance of these bonds amounted to about $350,000, the township compromised and reduced the debt to $148,000, and issued funding bonds to that amount to satisfy and cancel the original debt. The township of Oswego originally included the territory which now

constitutes the city of Oswego, and in March, 1871, steps were taken to organize and incorporate the village of Oswego as a city of the second class in pursuance of the provisions of chapter 59 of the Laws of 1871. It is contended by the plaintiffs below, who were tax-payers within the city of Oswego, that since that time Oswego has been at least a *de facto* city of the second class, and that the territory now composing the city was not a part of the township at the time the bonds were issued, and therefore not liable for the indebtedness represented by them, nor liable for any funding bonds based thereon. Some taxes were levied upon the property within the village, and collected from the tax-payers therein after the attempt to organize Oswego as a city of the second class in 1871; but both the township and the city resisted the payment of these bonds for several years, and until a compromise and settlement was effected in 1885. The tax-payers within the city now resist the payment of the taxes levied to meet the funding bonds issued to compromise and cancel the bonds above mentioned, but the court below sustained the tax levy to meet the first two classes of bonds — that is, the M. K. & T. Rly. bonds, and the bridge bonds; and it enjoined the collection of the third class, namely, the M. C. & N. W. bonds; and of this latter ruling the township complains.

The recent case of *Brown v. Milliken*, 42 Kas. 769, is an apt, and to a great extent a controlling, authority in the present case. The attempted organization of the city of Oswego in 1871, like that of Chetopa, was wholly void, and did not operate to create a municipality and to take it out of the township of Oswego. Chapter 59 of the Laws of 1871, under which both Oswego and Chetopa undertook to incorporate, was a direct violation of that provision of the constitution which prohibits the legislature from conferring corporate powers by a special act. (*City of Council Grove*, 20 Kas. 619; *Brown v. Milliken*, supra.) It furnished no authority for a separation of the city as a municipality from the township, nor will it, or the action of the people thereunder, relieve the tax-payers and property within the city from a bonded debt

which its people voluntarily incurred as a township debt after the passage of the act. It is true, that a corporation organized under an invalid law is sometimes held to be a corporation *de facto*, in order that justice may be done to innocent parties; but to sustain the claim of the defendant in error, that a *de facto* organization and separation from the township had been perfected, would work a legal injustice. While steps were taken under the void act to incorporate, and in some respects the people of the city acted as if their purpose was to carry on a separate municipality, yet the steps and acts taken

1. Railroad bonds, city not relieved from tax to pay.

and performed did not create such a *de facto* municipality as will separate it from the township and relieve the people therein from the debt which they were largely instrumental in voting upon the township as it then existed. A *de facto* organization such as would separate the city from the township, was not only not recognized by the people of the township outside of the city, but was not recognized and acquiesced in by the people within the city during the years when the bonds in question were voted and issued. It is true, that an election for the purpose of choosing some city officers was held in April, 1871, and that since that time the city has claimed the right to elect, and has elected some of the officers, and "has exercised many of the privileges and performed many of the duties provided or imposed by law upon cities of the second class." They did many things, however, during the same time which were inconsistent with the organization and maintenance of a separate municipality. The people within the city during all the years from 1871 to 1873, inclusive, acted and voted with the city in choosing township officers, voting township bonds, and upon all other questions submitted at township elections. The voting-place and precinct for said township at these elections was within the corporate limits of the town of Oswego, and the inhabitants of the town signed the petitions for the bond elections, and were largely instrumental in calling the elections and carrying them in favor of the propositions submitted. The people within the town had no city assessor during the

years 1871 and 1872, but joined with the people of the entire
township in selecting a township trustee, who assessed the
property of the township and town; and, more than that, the
trustee and assessor thus chosen resided within the limits of
the town. The township treasurer and clerk chosen at the
election in 1871 were residents of the town, and continued as
such during their entire terms of office; and the trustee, treas-
urer and clerk who were chosen in 1872 were residents and
citizens of the town at the time of the election, and continued
as such during their entire terms of office. It further ap-
pears that persons resident within the town were candidates
against persons residing outside of the limits of the town, and
defeated the outside candidates at the township elections. In
all these things the people of the town acted as though they
were inhabitants of the township, and their conduct was con-
sistent with the theory that the site of the town in which they
resided was within the territorial limits of the township. It
is fair to presume that these large debts would not have been
incurred had it not been for the action of the inhabitants of
the town. They signed the petitions calling the elections,
and generally voted in favor of the bond propositions sub-
mitted at such elections. The people within the town, as well
as without, proceeded upon the theory that all the electors in
both places had the right to vote a township debt, and that
the property of the entire township, including that of the
town, would be liable for the payment of such debt. Then,
again, the person who acted for the township in funding the
debt in question was a resident of the town, and since the
debt was funded the people of the town have contributed to
some extent toward the payment of the funding bonds that
were issued. Subsequently, and in June, 1880, the people of
the town took steps to organize as a city of the second class
under the general law, and thus to some extent they recog-
nized the fact that no separation had occurred prior to that
time. We are clearly of opinion that at the time the bonds
in question were authorized and issued the town of Oswego
did not constitute a *de facto* city of the second class, such as

separated it from the township, and therefore the case of *Brown v. Milliken,* supra, is an applicable and controlling authority.

It appears from the record that the validity of the bonds originally issued by the township has been tried and determined in the federal courts, and the question suggested as to whether the Memphis, Carthage & Northwestern Railway bonds were legally issued, is not before us. The bonds passed into the hands of persons claiming to be innocent holders thereof for value, and judgments were rendered against the township for interest that accrued and matured thereon prior to the funding of the debt. There was due on these bonds at the time they were funded about $90,000, but the representatives of the township succeeded in making a compromise which reduced the debt to $30,000. Under the authority of *Brown v. Milliken,* supra, and the cases there cited, it must be held that the tax levied upon the property within the city of Oswego for the payment of this debt was legal, and the judgment of the district court enjoining its collection is to that extent erroneous.

There are two other serious objections urged by the township against the judgment rendered against the tax, but in view of the conclusion we have reached upon the merits of the question it is unnecessary to discuss and determine them.

The defendants in error complain of the judgment rendered against them dissolving the injunction as to the tax levied to pay the interest on the funding bonds issued to compromise and fund the M. K. & T. Rly. bonds and the bridge bonds. They contend that the court erred in ignoring an agreement made between the mayor and clerk on the part of the city, and the township officers in behalf of the township. The agreement was dated July 1, 1887, and by it the township agreed to compromise and settle $63,000 of the debt, which it is recited might be compromised for $47,500 in cash, or $50,000 in the bonds of the township; and the city officers agreed that in consideration of the township assuming the payment of the $47,500 either by payment of cash or the issue

of its bonds the city would pay $23,750 in five equal install-
ments, which should be received in full of all obligations on the
part of the city on account of the $63,000 indebtedness. In
pursuance of this agreement, and on January 3, 1888, the
city paid to the township the sum of $2,060, but no other or
further payments have been made on account of the agreement.
It does not appear that the mayor and clerk of the city
were authorized by any vote of the people or the city council
to enter into such a contract, neither does it appear that the
township officers were authorized by a vote of the people of
the township to adjust the indebtedness or to relieve any por-
tion of the territory subject to taxation therefor from the
payment of its proportionate share of such debt. The in-
debtedness was a lien against the property of the township and
city, and no authority is given by the legislature or otherwise
for these subordinate officers to change the course of taxation
or to shift the burden of the debt from one portion of the mu-
nicipality to another. Aside from this, the creditor who held
the indebtedness was not a party to the agreement, and no
2. Void contract arrangement between the tax-payers could affect
—entire terri-
tory subject to the right of the creditor to have a levy extended
tax.          upon all the property subject to taxation for the
payment of his debt. We think there was no authority what-
ever in the officers to make the agreement, and that the court
properly ignored the same in the rendition of its judgment.

The further point is made against the tax levied to pay in-
terest on funding bonds issued to compromise and cancel a
judgment rendered against the township on what were known
as the M. K. & T. Rly. bonds and the interest thereon. It
appears that the township trustee confessed judgment on a
portion of the bonds before they were due. The judgment,
however, stands unreversed, and the funding bonds issued in
satisfaction of the judgment and the debt were for a much less
sum than the original debt. The judgment was a finality, and
the creditor having accepted the funding bonds, the judgment
is satisfied and canceled, and both the city and the township
are released from the payment of the judgment or the original

indebtedness which it represented. The funding bonds issued to compromise and cancel the judgment are binding obligations against the township, and certainly it would be estopped from setting up the irregularity that a part of the debt was not due when the judgment was rendered; and that being true, every tax-payer of the township, including the defendants in error, are likewise estopped. (*Brown v. Milliken*, supra.) Further than that, all parties to this proceeding have agreed that these funding bonds which were executed and delivered in satisfaction of the judgment, were "issued in all respects in compliance with the law and are valid outstanding obligations against said township."

Our opinion is that the judgment of the court below in favor of the township and dissolving the injunction is correct, and should stand. That part of the judgment, however, which perpetually enjoins the levy and collection of taxes to pay the interest upon the $30,000 bonds issued to compromise and cancel the Memphis, Carthage & Northwestern Railway bonds issued by the township, should be reversed, and the cause remanded with the direction to dissolve the temporary injunction theretofore granted against the levy and collection of all the taxes, and to render judgment in favor of the defendants below for costs.

That will be the judgment of this court.

All the Justices concurring.